1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*E-FILED - 11/10/09*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BARTOLO MULLEN,                        )        No. C 03-3676 RMW (PR)
                                       )
                                       )        ORDER DISMISSING
          Plaintiff,                   )        DEFENDANTS FU AND
   v.                                  )        BENHAM; GRANTING
                                       )        DEFENDANTS' MOTIONS
                                       )        FOR SUMMARY JUDGMENT
STEPHEN SURTSHIN, et al.,              )
                                       )        (Docket No. 127)
          Defendants.                  )
_____)

          Plaintiff filed a pro se civil rights action pursuant to 42 U.S.C. § 1983 against employees

of Napa State Hospital ("NSH") and Disability Rights Center ("DRC").  On March 25, 2009,

NSH defendants moved for summary judgment.  On June 1, 2009, DRC defendants moved for

summary judgment.  On June 3, 2009, the court sua sponte granted plaintiff an extension of time

to file his opposition.  (Docket No. 135.)  On August 7, 2009, the court again sua sponte granted

plaintiff an extension of time to file his opposition.  (Docket No. 144.)  Although plaintiff's

opposition was due September 21, 2009, plaintiff failed to file an opposition.  Having carefully

considered the papers submitted, the court hereby DISMISSES defendants Benham and Fu, and

GRANTS defendants' motions for summary judgment for the reasons set forth below.

**BACKGROUND**[1]

Plaintiff was civilly committed to NSH after being found not guilty by reason of insanity in a criminal trial.  (NSH Motion for Summary Judgment ("MSJ") at 2.)

On November 28, 2000, Plaintiff asserts that defendant Carol Ann Kuchmak, an NSH staff psychiatric physician, tied him to a bed and forced him to take injections of a psychiatric drug, Thorazine, because plaintiff called another social worker a "bitch."  (Second Amended Complaint ("SAC") at 3-4.)  NSH defendants claim that plaintiff tried to force his way into the nurses' station to physically attack a social worker, Tracey Blunt, and threatened to kill her. (NSH MSJ at 3-4; Kuchmak Decl. at 2.)  When another social worker tried to keep the door closed to prevent plaintiff from coming in, plaintiff stopped her from doing so and continued to try to force his way in.  (Kuchmak Decl. at 2.)  During plaintiff's attempt to get to the social worker, he called her a "bitch."  (Id.)  Once plaintiff was restrained, he was ordered into seclusion, and given Thorazine to calm him.[2]  (SAC at 3-4; Kuchmak Decl. at 2.)  Defendant Kuchmak asserts that if name-calling was all that plaintiff had done toward the social worker, he would not have been restrained, secluded, or given Thorazine.  (Kuchmak Decl. at 2-3.) Defendant Kuchmak was more concerned about the violent and dangerous nature of plaintiff's behavior than the name-calling.  (Id.)

As a result of the seclusion and injections, plaintiff filed a complaint with the State Medical Board against defendant Kuchmak, and alleges that defendant Kuchmak began falsifying his medical records in order to cover up her mistakes.  (SAC at 3-4.)  Defendant Kuchmak learned of the complaint on November 30, 2000.  (SAC at 4; Kuchmak Decl. at 3.) The Board found the claim to be meritless.  (Kuchmak Decl. at 3.)  That same day, defendant Kuchmak wrote that plaintiff was "severely psychotic" and typed up four pages of Physician

---

[1]  The facts stated herein are undisputed unless otherwise noted.

[2]  Plaintiff states that defendant Kuchmak was the one who restrained him and ordered his seclusion (SAC at 3-4) while defendant Kuchmak asserts it was another of the staff members (Kuchmak Decl. at 2-3).  However, defendant Kuchmak did approve of the actions and orders taken.  (Id. at 2.)  Regardless, this factual dispute is irrelevant to the disposition of this claim.

1   Progress Notes ("PPN") to summarize plaintiff's progress at NSH.  (SAC at 4, Ex. 14; Kuchmak

2   Decl. at 3.)  The PPN are created monthly and plaintiff's PPN were not due for another two

3   weeks.  (SAC at 4.)  In the PPN, defendant Kuchmak recited her review of the incident and

4   determined that the staff's actions were appropriate.  (NSH MSJ at 4, Kuchmak Decl. at 2-3.)

5   These specific PPN were the longest and only ones that defendant Kuchmak had ever written.

6   (SAC at 4.)  The following day, defendant Kuchmak ordered plaintiff to be transferred.  (Id., Ex.

7   14.)  Defendant Kuchmak states she ordered the transfer because it was plaintiff's second

8   attempt to injure his social worker, and prior to that, plaintiff was observed stalking and

9   threatening the social worker.  (Kuchmak Decl. at 3 and Ex. B.)  Defendant Kuchmak avers that

10  she has never falsified plaintiff's medical records and that the PPN and accompanying Transfer

11  Note accurately reflected her professional opinion of plaintiff's diagnosis.  (Id. at 3.)  Plaintiff

12  states that defendant Kuchmak falsified both the PPN and the Transfer Note to "hide" what she

13  had done regarding the seclusion and Thorazine.  (SAC at 4.)  Plaintiff believes defendant

14  Kuchmak actions were a form of retaliation.  (Id.)

15          Sometime between 2000 and 2001, defendant Julius Fu, a psychiatrist, placed plaintiff in

16  a seclusion room because plaintiff refused to attend a treatment team conference after defendant

17  Fu began yelling at him.  (SAC at 5.)

18          From 2001 through 2003, psychiatrist Stephen Surtshin,[3] defendants Chris Echols, a

19  psychologist; Patricia White, a psychologist; Sara Isadore, a psychiatric social worker; John

20  Benham, program director; and Glena Hepner, a registered psychiatric nurse, made up plaintiff's

21  "Treatment Team."  (Id. at 2.)   On October 21, 2002, the Treatment Team created a Behavioral

22  Management Plan.  (SAC at 2, Ex. 1.)  Plaintiff asserts that the Plan was instituted in retaliation

23  for voicing his complaints against NSH, and as evidence of such, he points to a line in the Plan

24  indicating that one of plaintiff's antecedent behaviors is "Multiple phone calls to complain about

25

26

27          [3] Stephen Surtshin was formerly a named defendant, however, on September 9, 2009, the
28  court dismissed him based on defense counsel's notice of Surtshin's death.  (Docket No. 146.)
    Accordingly, all claims solely against Surtshin are not addressed in this order.

1  staff to various agencies or groups."[4]  (Id.)  Also noted in the Plan is plaintiff's "Problem Target
2  Behavior:  Swears and spits at staff; kicks doors; picks up chair to threaten others; verbally
3  threatens to have a staff fired or to harm a staff member.  Makes threatening remarks to staff,
4  e.g., racial slurs, to get staff fired, to hurt staff, exploit vulnerability (e.g., "Your baby is born
5  mentally ill / retarded.")."  (Id.)

6       Further, affidavits from members of plaintiff's Treatment Team aver that the October 21,
7  2002 Plan was implemented in order to specifically attempt to treat the stated "Problem Target
8  Behavior," and not to curtail any of plaintiff's filing of complaints.  (Isadore Decl. at 2; Hepner
9  Decl. at 2-3; Echols Decl. at 2-3; White Decl. at 2.)  In addition, defendants state that the Plan
10  did not give NSH staff permission to place plaintiff in seclusion for any reason, nor take any
11  action against plaintiff for making complaints, and in fact, expressly advised staff to offer
12  plaintiff complaint forms should plaintiff wish to complain.  (Hepner Decl. at 2-3; White Decl. at
13  2.)

14       On November 7, 2002, Dr. Surtshin, along with defendants Echols, Isadore, and Hepner,
15  prepared a list of expectations for plaintiff outlining how he could regain some lost privileges.
16  (SAC, Ex. 4.)  Contrary to plaintiff's statements that defendants formed this list in retaliation for
17  his filed complaints, defendant Hepner declared that the list was prepared to give plaintiff
18  guidelines as to how he could regain certain privileges of roaming the grounds unsupervised.
19  (Hepner Decl. at 4.)  Plaintiff lost those privileges because of "his repeated engagement in
20  problem behaviors" as listed in the Behavioral Management Plan.  (Id.)  The purpose of the list
21  was only to attempt to treat the behavioral problems that resulted in plaintiff's loss of privileges.
22  (Id., Echols Decl. at 2; Isadore Decl. at 3.)

23       On January 16, 2003, Dr. Surtshin, along with defendants Echols, Isadore, and Hepner,
24  created a Guidelines for Religious Services ("Guidelines"), which outlined how plaintiff was to
25  attend religious services in the religion of his choosing.  (Isadore Decl. at 2-3; Echols Decl. at 4;

26
27  _____
    [4]  The court notes that the line is actually redacted, initialed by defendant Echol, and
28  dated "11-21-02."  Defendant Echols acknowledges that after the Plan was written, subsequent
    changes to the Plan were made to prevent it from being "misinterpreted to allow any denial of
    plaintiff's rights."  (Echols Decl. at 3; White Decl. at 2.)

1   Hepner Decl. at 4.)  Defendants state that these Guidelines were implemented after plaintiff was

2   observed engaging in improper conduct, such as "inappropriate socializing with male peers," and

3   after plaintiff was suspected to be abusing illegal substances.  (Echols Decl. at 3-4.)  The

4   Guidelines were a means to allow plaintiff to attend religious services while attempting to

5   prevent plaintiff's illegal activities.  (Id.)  Plaintiff believes his Treatment Team created these

6   "plans" to retaliate against him for filing complaints against NSH.  (SAC at 2.)

7        In May 2006, NSH discontinued its subscription to West Mate, an online internet legal

8   research system.  (SAC at 11.)  In its place, NSH installed Touch Sonic Technologies legal

9   research system.  (Id.)  According to plaintiff, an unnamed Supervising Patient's Rights

10  Specialist at NSH told him that NSH stopped subscribing to West Mate because it was being

11  used by multiple users, which was not covered in its contract, and NSH could not afford the

12  contract for multiple users.  (Id. at 12.)

13       In June and early July 2007, NSH learned that some patients were using counterfeit

14  money at an NSH store.  (NSH MSJ at 6.)  On July 9, 2007, after receiving a report that plaintiff

15  and another patient in plaintiff's unit, Mr. Jasper, were creating counterfeit money with

16  plaintiff's computer and printer, NSH staff searched the bed area of Mr. Jasper and discovered

17  several counterfeit bills.  (NSH MSJ at 6; Gallegos Decl. at 2.)  Defendant NSH Police Officer

18  Jesus Gallegos and other hospital police officers told plaintiff they were going to confiscate his

19  computer to look for evidence of counterfeiting money.  (SAC at 5.)  Plaintiff learned that a

20  jailhouse informant gave the police a false report that plaintiff was producing counterfeit money

21  and that was why the police seized and searched plaintiff's computer.  (Id. at 6.)  Plaintiff asserts

22  that defendant Gallegos and other officers took his computer, printer, and accessories.  (Id. at 5.)

23  They also confiscated a computer and other property from Lance Kerin, another patient, for the

24  same reason.  (Id.)  On July 18, 2007, defendant Gallegos served both plaintiff and Kerin with a

25  search warrant permitting an examination of the computer and accessories for evidence of

26  counterfeiting.  (SAC at 5; Gallegos Decl. at 3 and Ex. A.)  Plaintiff asserts that in the search

27  warrant, defendant Gallegos "perjured" himself because no counterfeiting evidence was found

28  and defendant Gallegos was not truthful as to the reason for the search.  (SAC at 5-6.)

1    On September 25, 2007, defendant Gallegos had plaintiff's personal property and told

2    plaintiff he would receive his computer and other property back if plaintiff would sign a receipt

3    stating such. (SAC at 6.) Once plaintiff signed the receipt, the Treatment Team told him that

4    they could not give his computer back because defendant Moraida, a retired NSH Program

5    Director, needed to send it to the maintenance department. (Id.) Because plaintiff was a

6    registered sex offender, defendant Moraida states he wanted to ensure that plaintiff's computer

7    could not access the wireless internet, because that was prohibited at NSH. (NSH MSJ at 7;

8    Gallegos Decl. at 3; Moraida Decl. at 2.) Plaintiff was not told why defendant Moraida was

9    sending his computer to the maintenance department. (SAC at 7.) After all improper features

10   were removed from the computer, Moraida was told by his superiors to hold onto plaintiff's

11   computer because NSH was starting a new policy banning personal computers. (NSH MSJ at 7;

12   Moraida Decl. at 2.) Moraida refused to tell plaintiff why or for how long his computer would

13   be withheld. (SAC at 7.) Thereafter, NSH decided not to ban personal computers after all and

14   plaintiff received his computer and accessories on or before November 7, 2007. (NSH MSJ at 7;

15   Moraida Decl. at 2-3.)

16   Defendant Ed Foulk, NSH Executive Director, was aware of the search warrant and all

17   events surrounding the confiscating of plaintiff's computer. (SAC at 7.) Plaintiff asserts that the

18   taking of his property was a form of retaliation for plaintiff's filing of complaints about the

19   abuses at NSH, and as a result of the confiscation, all of his legal files were permanently lost or

20   destroyed. (SAC at 7-8.)

21   During plaintiff's commitment at NSH, he asked defendants Catherine Blakemore,

22   Executive Director of Protection & Advocacy (now DRC); Michelle Mudgett, Director of the

23   Office of Patients' Rights (a division of DRC); and Susan Kessler, the Patients' Rights

24   Advocate, to assist him in resolving conflicts with NSH. (SAC at 9-10.) Each time that plaintiff

25   asked DRC to help protect him specifically from hospital police misconduct, defendants Mudgett

26   and Kessler would respond that DRC has no grounds to redress police matters. (SAC at 10.)

27   ///

28   ///

**ANALYSIS**

I.      **Rule 4(m) -- Defendants Benham and Fu**

On June 17, 2009, counsel for defendants filed a letter indicating that on July 9, 2008, Deborah Moore, an NSH agent, mistakenly accepted service on behalf of defendants Benham and Fu.  Defense counsel stated that defendants Benham and Fu were not employed by Napa State Hospital at any time on July 9, 2008, or thereafter.  Defense counsel was unable to obtain their whereabouts in order to get their consent to representation by the Attorney General's Office.  As a result, neither defendant Benham nor Fu have been properly served with plaintiff's second amended complaint.

On September 8, 2009, the court notified plaintiff that because he had not served defendants Benham nor Fu, nor provided sufficient information to allow the Marshal to locate and serve defendants Benham nor Fu, he must remedy the situation or face dismissal of his claims against said defendants without prejudice.  See Walker v. Sumner, 14 F.3d 1415, 1421-22 (9th Cir. 1994), overruled on other grounds by Sandin v. Connor, 515 U.S. 472 (1995).  The court also warned plaintiff that failure to do so within 30 days would result in dismissal of defendants Benham and Fu under Rule 4(m).  See Fed. R. Civ. P. 4(m).

To date, plaintiff has not contacted the court nor provided any location information for defendants Benham or Fu.  Accordingly, defendants Benham and Fu are DISMISSED from this action.

II.     **Motion for Summary Judgment**

A.      Standard of Review

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

The party moving for summary judgment bears the initial burden of identifying those

1  portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine

2  issue of material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  Where the moving

3  party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no

4  reasonable trier of fact could find other than for the moving party.  But on an issue for which the

5  opposing party will have the burden of proof at trial, the moving party need only point out "that

6  there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

7       A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is

8  based on personal knowledge and sets forth specific facts admissible in evidence.  See Schroeder

9  v. McDonald, 55 F.3d 454, 460 & n.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint

10  as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746,

11  plaintiff stated under penalty of perjury that contents were true and correct, and allegations were

12  not based purely on his belief but on his personal knowledge).  Plaintiff's verified second

13  amended complaint is considered in deciding the pending motions.

14       Once the moving party meets its initial burden, the nonmoving party must go beyond the

15  pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

16  genuine issue for trial."  Fed. R. Civ. P. 56(e).  The court is only concerned with disputes over

17  material facts and "factual disputes that are irrelevant or unnecessary will not be counted."

18  Anderson, 477 U.S. at 248.  It is not the task of the court to scour the record in search of a

19  genuine issue of triable fact.  Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996).  The

20  nonmoving party has the burden of identifying, with reasonable particularity, the evidence that

21  precludes summary judgment.  Id.  If the nonmoving party fails to make this showing, "the

22  moving party is entitled to judgment as a matter of law."  Celotex Corp., 477 U.S. at 323.

23       B.     Napa State Hospital Employees

24       Plaintiff raises a claim of retaliation against NSH defendants Echols, White, Isadore,

25  Hepner, Kuchmak, Gallegos, Moraida, and Foulk.  Specifically, plaintiff alleges that (1) his

26  Treatment Team retaliated against him by creating treatment plans in response to plaintiff's

27  filing of grievances against NSH (SAC at 2-3); (2) Kuchmak retaliated against plaintiff by

28  restraining him and forcing him to take Thorazine and then falsified his medical records after he

1  filed a complaint with the State Medical Board (id. at 3-4); (3) Gallegos, Moraida, and Foulk

2  retaliated against plaintiff by seizing his computer and withholding it from him for filing

3  complaints about the abuses occurring at NSH (id. at 5-8); and (4) unnamed employees retaliated

4  against him by discontinuing the use of West Mate and denying him legal materials (id. at 11-

5  13).

6                   1.    Retaliation

7          A claim may be stated under § 1983 where a plaintiff alleges retaliation by state actors

8  for the exercise of his First Amendment rights.  See Mt. Healthy City Bd. of Educ. v. Doyle, 429

9  U.S. 274, 283-84 (1977). The plaintiff must show that the type of activity he was engaged in was

10  protected by the First Amendment and that the protected conduct was a substantial or motivating

11  factor for the alleged retaliatory acts.  See id. at 287.  Retaliation is not established simply by

12  showing adverse activity by defendant after protected speech; rather, plaintiff must show a nexus

13  between the two.  See Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation

14  claim cannot rest on the logical fallacy of post hoc, ergo propter hoc, i.e., "after this, therefore

15  because of this").  In order to create a genuine issue of material fact on retaliatory motive in the

16  First Amendment context, a plaintiff must establish "in addition to evidence that the defendant

17  knew of the protected speech, at least (1) evidence of proximity in time between the protected

18  speech and the allegedly retaliatory decision; (2) evidence that the defendant expressed

19  opposition to the speech; or (3) evidence that the defendant's preferred reason for the adverse

20  action was pretextual." Corales v. Bennett, 567 F.3d 554, 568 (9th Cir. 2009) (internal citation

21  and emphasis omitted).

22          A plaintiff must show a causal connection between a defendant's retaliatory animus and

23  subsequent injury in any sort of retaliation action.  Hartman v. Moore, 547 U.S.  250, 259

24  (2006).  The requisite causation must be but-for causation, without which the adverse action

25  would not have been taken; upon a prima facie case of retaliatory harm, the burden shifts to the

26  defendant official to demonstrate that even without the impetus to retaliate he would have taken

27  the action complained of.  Id. at 260.  If there is a finding that retaliation was not the but-for

28  cause of the action complained of, the claim fails for lack of causal connection between

1    unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the

2    official's mind. Id.  "It may be dishonorable to act with an unconstitutional motive and perhaps

3    in some instances be unlawful, but action colored by some degree of bad motive does not amount

4    to a constitutional tort if that action would have been taken anyway." Id. (citations omitted);

5    accord Wilkie v. Robbins, 551 U.S. 537, 560 n.10 (2007) (rejecting argument that an ill motive

6    alone supports a retaliation claim; "proof that the action was independently justified on grounds

7    other than the improper one defeats the claim").

8                              a.    *The Treatment Team Plans*

9            According to plaintiff's SAC, plaintiff's Treatment Team drafted several behavioral plans

10   for him in order to place him in seclusion when he lodged complaints against NSH or its staff.

11   (SAC at 2.)

12          As a threshold matter, plaintiff has established as a matter of law that his conduct -- the

13   filing of complaints or grievances -- meets the core requirement of the retaliation analysis, that

14   is, that it is constitutionally protected under the First Amendment.  Cf. Cornett v. Donovan, 51

15   F.3d 894, 898 (9th Cir. 1995) ("right of access [to the courts] is guaranteed to people

16   institutionalized in a state mental hospital regardless of whether they are civilly committed after

17   criminal proceedings or civilly committed on grounds of dangerousness"); Rizzo v. Dawson, 778

18   F.2d 527, 531-32 (9th Cir. 1985) (recognizing that punishment in retaliation for exercising a

19   right to access the courts may violate the First Amendment).  However, for the reasons stated

20   below, the court concludes that plaintiff fails to show defendants harbored a retaliatory motive or

21   that any retaliatory motive was the cause of the treatment plans.

22          Defendants aver that each treatment plan was created in an effort to address plaintiff's

23   problem behaviors such as making threatening remarks to staff (SAC, Ex. 1), allow plaintiff to

24   regain certain grounds privileges (Hepner Decl. at 4), and prevent plaintiff from engaging in

25   improper conduct (Echols Decl. at 3-4).  Plaintiff does not demonstrate that "in addition to

26   evidence that the defendant knew of the protected speech, at least (1) evidence of proximity in

27   time between the protected speech and the allegedly retaliatory decision; (2) evidence that the

28   defendant expressed opposition to the speech; or (3) evidence that the defendant's preferred

1   reason for the adverse action was pretextual.'" Corales, 567 F.3d at 568.  Although defendants

2   did know about plaintiff's varied complaints, plaintiff does not show that the complaints were

3   made just prior to the creation of a treatment plan, that any of the defendants "expressed

4   opposition" to the complaints, or that any of defendants' reasons for the treatment plans were

5   pretextual.  Id.  Accordingly, plaintiff cannot demonstrate that defendant harbored a retaliatory

6   motive.

7           Further, even assuming that any of these defendants was motivated by some retaliatory

8   intent, in light of the evidence presented, the undisputed facts, and taking the remaining facts

9   presented by the plaintiff as true, the court concludes that any retaliatory animus was not the but-

10  for cause of the creation of these behavioral treatment plans.  See Hartman, 547 U.S. at 259.

11  Defendants gave reasons independent of any potential retaliatory motive for instituting the three

12  treatment plans and plaintiff has failed to dispute those reasons or proffer any explanation as to

13  why those reasons are not sufficient to defeat summary judgment on this claim.  See id.  In fact,

14  plaintiff does not dispute any of the defendants' statements regarding their motive, nor does he

15  offer any non-conclusory, specific evidence of his own.  See also Thornton v. City of St. Helens,

16  425 F.3d 1158, 1167 n. 4 (9th Cir. 2005) (finding that, in an equal protection case, conclusory

17  statement of bias is not sufficient to carry non-moving party's burden).

18          Accordingly, the court finds that defendants have shown that no genuine issue of material

19  fact exists by demonstrating that "there is an absence of evidence" to support plaintiff's claim of

20  retaliation.  Celotex, 477 U.S. at 325.  Further, when the facts are viewed in the light most

21  favorable to plaintiff, he has not produced "specific evidence, through affidavits or admissible

22  discovery material" to show that a dispute regarding defendants' motives exists.  Bhan v. NME

23  Hosps., Inc., 929 F.2d 1404, 1049 (9th Cir. 1991).

24          NSH defendants are entitled to summary judgment on this claim.

25                          b.      *Seclusion and Thorazine incident*

26          According to plaintiff's SAC, on November 28, 2000, defendant Kuchmak tied him to a

27  bed with restraints and forced him to take a psychiatric drug, Thorazine, because plaintiff called

28  a social worker a "bitch."  (SAC at 3.)  Plaintiff filed a complaint with the State Medical Board

1    about this incident and alleges that defendant Kuchmak began falsifying his medical records in

2    order to cover up her mistakes.  (Id. at 3-4.)

3          Defendants respond that plaintiff's claim is barred by the statute of limitations.  Section

4    1983 does not contain its own limitations period.  The appropriate period is that of the forum

5    state's statute of limitations for personal injury torts.  See Wilson v. Garcia, 471 U.S. 261, 276

6    (1985).  Prior to January 1, 2003, the applicable statute of limitations period in California was

7    one-year.  See Maldonado v. Harris, 370 F.3d 945, 954-55 (9th Cir. 2004).  Accordingly,

8    because plaintiff filed his original complaint on August 7, 2003, without tolling, plaintiff's claim

9    is untimely by almost two years.  Cf. Sain v. City of Bend, 309 F.3d 1134, 1136-37 (9th Cir.

10   2002) (stating that a § 1983 claim is commenced by filing a complaint with the court).

11         Further, because plaintiff is a civilly confined patient rather than a prisoner, he is not

12   entitled to statutory tolling.  See Jonas v. Blanas, 393 F.3d 918, 927-28 (9th Cir. 2004).

13   However, because plaintiff has been civilly committed for an uninterrupted period and appears to

14   have pursued his claims in good faith, he is entitled to equitable tolling.  See id. at 928-30.

15   Accordingly, the court concludes that plaintiff's claim against defendant Kuchmak is not time-

16   barred and will address the merits of plaintiff's retaliation claim against defendant Kuchmak

17   below.

18         Plaintiff appears to allege two instances of retaliation against defendant Kuchmak.  First,

19   when defendant Kuchmak restrained him and ordered Thorazine injections in retaliation for

20   calling the social worker a "bitch," and next, when defendant Kuchmak falsified the PPN in

21   order to cover up her mistakes after she learned that plaintiff filed a complaint about her to the

22   medical board.

23         With respect to the order of seclusion and drug, plaintiff fails to demonstrate that he was

24   engaging in a constitutionally protected activity when he called the social worker a "bitch."  See

25   Mt. Healthy, 429 U.S. at 283-84, 287.  Plaintiff cannot not and does not allege that name-calling

26   is protected speech under the First Amendment.  See id.  Alternatively, even assuming plaintiff

27   has properly shown he was engaging in a constitutionally protected activity, plaintiff fails to

28   demonstrate a nexus between the protected activity and the restraint or seclusion.  See Dietrich v.

1   John Ascuaga's Nugget, 548 F.3d 892, 901 (9th Cir. 2008) (finding no retaliation where plaintiff

2   presented no evidence that defendants gave her a traffic citation after reading a newspaper article

3   about her First Amendment activities, rather than because she drove past a police barricade with

4   a "road closed" sign on it).  The mere fact that plaintiff was ordered into seclusion and given

5   Thorazine soon after calling a social worker a "bitch," is not enough without a showing that

6   there is a nexus between the two events.  See Huskey v. City of San Jose, 204 F.3d 893, 899 (9th

7   Cir. 2000).

8        In addition, while filing a complaint with the medical board is constitutionally protected

9   under the First Amendment, cf. Cornett, 51 F.3d at 898, plaintiff does not allege that defendant

10  Kuchmak falsified the PPN in an attempt to inhibit the exercise of plaintiff's First Amendment

11  rights, see Mendocino Envtl. Ctr. v. Mendocino County, 192 F.3d 1283, 1300 (9th Cir. 1999).  In

12  an analysis of a retaliation claim, plaintiff need not demonstrate that his speech actually was

13  inhibited or suppressed; rather, the proper inquiry is whether the official's acts would chill or

14  silence a person of ordinary firmness from future First Amendment activities.  See id.  The goal

15  is to prevent, or redress, actions by a government official that chill the exercise of protected First

16  Amendment rights.  Coszalter v. City of Salem, 320 F. 3d 968, 974-75 (9th Cir. 2003)

17       In contrast here, taking plaintiff's facts as true, defendant Kuchmak's falsified the PPN in

18  an attempt to  "cover-up" the order of seclusion and drugs.  (SAC at 4.)  A cover-up is not a type

19  of action that would chill or silence a person of ordinary firmness from future First Amendment

20  activities.  See Mendocino Envtl. Ctr, 192 F.3d at 1300.  A cover-up to protect oneself also does

21  not demonstrate an intent to inhibit plaintiff's First Amendment rights.  See id.  In other words,

22  even if defendant Kuchmak lied in the PPN to "conceal her malfeasance," plaintiff cannot and

23  does not claim that an ordinary person would feel that her actions would chill any First

24  Amendment right.  See id.

25       The record before the court does not demonstrate a genuine issue of material fact.

26  Taking plaintiff's facts as true, defendant Kuchmak is entitled to summary judgment on this

27  claim.

28              c.    *Confiscation of plaintiff's computer*

Order Dismissing Defendants Fu and Benham; Granting Defendants' Motions for Summary Judgment
P:\PRO-SE\SJ.Rmw\CR.03\Mullen676grant.msj.wpd    13

1    According to plaintiff's SAC, defendants Officer Gallegos, Moraida, and Foulk

2 confiscated plaintiff's computer and withheld it from him in retaliation for the many complaints

3 plaintiff filed against NSH.  (SAC at 5-7.)

4    Plaintiff concedes that defendant Gallegos confiscated his computer based on a tip from a

5 jailhouse informant that plaintiff and another patient were creating counterfeit money.  (SAC at

6 5-6.)  In other words, plaintiff concedes that even without the impetus to retaliate, defendant

7 Gallegos would have confiscated plaintiff's computer, and indeed, did.  See Hartman, 547 U.S.

8 at 260.  Even assuming defendant Gallegos confiscated plaintiff's computer based on an

9 unconstitutional retaliatory motive, because defendant Gallegos would have confiscated the

10 computer based on the jailhouse informant's tip, plaintiff's retaliation claim again him is

11 defeated based on lack of causation.  Id.  Plaintiff fails to show a "but-for" connection between a

12 retaliatory motive and any injury, and accordingly, defendant Gallegos is entitled to summary

13 judgment on this claim.  Id.

14    Plaintiff's claim against defendant Moraida merely states that defendant Moraida was

15 sending plaintiff's computer to the maintenance department for some unknown reason and that

16 defendant Moraida then held plaintiff's computer at the request of defendant Galllegos.  (SAC at

17 6-7.)  At no time does plaintiff allege that defendant Moraida was withholding plaintiff's

18 computer because plaintiff filed complaints against NSH or that defendant Moraida took any

19 action that would potentially chill plaintiff's First Amendment rights.  See Hartman, 547 U.S. at

20 260.  In addition, plaintiff fails to demonstrate that his filing of complaints was the "but for"

21 reason defendant Moraida kept his computer.  See Corales, 567 F.3d at 568.  Defendant Moraida

22 states that he sent plaintiff's computer to the maintenance department because, as a registered

23 sex offender, plaintiff was not allowed to have certain features on his computer and defendant

24 wanted to ensure that all improper features were removed.  (Moraida Decl. at 2-3.)  Further,

25 plaintiff has failed to establish that defendant Moraida knew that plaintiff had filed any

26 complaints against NSH, much less that the filing of a complaint occurred near the time

27 defendant Moraida withheld plaintiff's computer, that defendant Moraida "expressed opposition"

28 to any complaint filing, or that defendant Moraida's reason for keeping the computer was false.

1   <u>Corales</u>, 567 F.3d at 568.  Accordingly, defendant Moraida is entitled to summary judgment on

2   this claim.

3          Plaintiff's claim against defendant Foulk merely alleges that, as Executive Director of

4   NSH, Foulk was aware of both Gallegos' and Moraida's actions as they pertained to the

5   confiscating of plaintiff's computer.  (SAC at 7.)   As Executive Director, defendant Foulk may

6   be liable under section 1983 upon a showing of (1) personal involvement in the constitutional

7   deprivation or (2) a sufficient causal connection between the his wrongful conduct and the

8   constitutional violation.  <u>Redman v. County of San Diego</u>, 942 F.2d 1435, 1446 (9th Cir. 1991)

9   (en banc) (citation omitted).  A supervisor generally "is only liable for constitutional violations

10  of his subordinates if the supervisor participated in or directed the violations, or knew of the

11  violations and failed to act to prevent them."  <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir.

12  1989).  To defeat summary judgment, however, sweeping conclusory allegations will not suffice;

13  the plaintiff must instead "set forth specific facts as to each individual defendant's" actions

14  which violated his or her rights.  <u>Leer v. Murphy</u>, 844 F.2d 628, 634 (9th Cir. 1988).  Here,

15  plaintiff's allegations are unsupported by any factual showing of Foulk's personal involvement,

16  knowledge, or causal connection.  <u>See</u> <u>Redman</u>, 942 F.3d at 1446.  Further, because the court has

17  concluded that defendants Gallegos and Moraida are entitled to summary judgment as a matter

18  of law, plaintiff has also failed to allege a prima facie case of retaliation under a supervisory

19  theory of liability against defendant Foulk.  Accordingly, defendant Foulk is entitled to summary

20  judgment as a matter of law.

21                    d.     *West Mate and legal materials*

22         Plaintiff fails to link any named defendant to his alleged violation that NSH discontinued

23  providing West Mate and replaced it with Touch Sonic.  <u>See</u> <u>Gillespie v. Civiletti</u>, 629 F.2d 637,

24  642 (9th Cir. 1980) (noting that the use of Doe defendants is not favored).  The named

25  defendants cannot be held liable simply based on their membership in a group; rather, each

26  individual defendant's participation in unlawful conduct must be shown.  <u>Chuman v. Wright</u>, 76

27  F.3d 292, 294-95 (9th Cir. 1996).  Plaintiff has not named *any* individual who was involved in

28  the official change from West Mate to Touch Sonic, much less one of the named defendants.

1    Accordingly, defendants are entitled to summary judgment on this claim.

2    2.    Inadequate Medical Care / Due Process[5]

3    Liberally construed, plaintiff claims that defendant Kuchmak violated his right to due

4    process because she ordered him into seclusion and forced him to take Thorazine and falsified

5    his medical records by changing his mental health diagnosis to make it appear as if the order of

6    seclusion and Thorzaine were warranted.  (SAC 3-4, 8.)

7    "Persons who have been involuntarily committed are entitled to more considerate

8    treatment and conditions of confinement than criminals whose conditions of confinement are

9    designed to punish." Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982).  To determine whether

10   the nature and extent of an infringement of one of these liberty interests rises to the level of a due

11   process violation, a court must balance the individual's liberty interest against the relevant state

12   interests, as measured by the state's asserted reasons for restraining the individual. Id. at 320-21.

13   The court must only make certain that professional judgment in fact was exercised in making the

14   pertinent decision. Id. at 321-22.  "[T]he decision, if made by a professional, is presumptively

15   valid; liability may be imposed only when the decision by the professional is such a substantial

16   departure from accepted professional judgment, practice, or standards as to demonstrate that the

17   person responsible actually did not base the decision on such judgment." Id. at 323.  Courts

18   undertaking this inquiry are restricted to two questions: "(1) whether the decisionmaker is a

19   qualified professional entitled to deference, and (2) whether the decision reflects a conscious

20   indifference amounting to gross negligence, so as to demonstrate that the decision was not based

21   upon professional judgment." Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992).

22   Here, there is no genuine issue of material fact as to whether defendant Kuchmak is a

23   qualified professional. See Youngberg, 457 U.S. at 327.  Defendant Kuchmak declared that she

24   _____

25   [5] Because plaintiff is not a prisoner, the Eighth Amendment is not the proper vehicle for
     him to challenge the conditions of their civil confinement. Cf. Hydrick v. Hunter, 500 F.3d 978,
26   983 (9th Cir. 2007) (discussing constitutional rights of those civilly committed under the
     Sexually Violent Predators Act), vacated on other grounds, 129 S. Ct. 2431 (2009).  However,
27   the same claims for inhumane treatment and failure to protect may be raised under the
     Fourteenth Amendment. Id.  The standard applicable under the Fourteenth Amendment is *at
28   least* coextensive with that applicable to prisoners under the Eighth Amendment. Id.

1   is a doctor of medicine, licensed to practice in California, and employed as a psychiatrist at

2   NSH. (Kuchmak Decl., p. 1.)

3        Defendant Kuchmak also declares that she exercised professional judgment when she

4   concurred with the order of seclusion and Thorazine, as well as wrote the PPN. (Id. at 2-4.) In

5   support of her assessment, defendant submits internal hospital notes, written by several NSH

6   staff members, surrounding the November 28, 2000 incident. (Brown Decl., Exs. H-J.) The

7   notes state that on November 28, 2000, Kathleen Tilman, MSW, was conducting a treatment

8   group with Social Worker Tracey Blunt. (Id., Ex. I at 1.) Plaintiff knocked on the door and

9   began yelling at Blunt, accusing her of keeping him from having a smoke break. (Id.) When

10  Tilman started to close the door, plaintiff prevented her from doing so and continued to yell

11  threats at Blunt. (Id.) At that time, Blunt sounded an alarm. (Id.) Plaintiff was ordered into

12  seclusion and a prescribed dose of Thorazine.[6] (Id., Ex. H, Ex. I at 3.) Defendant Kuchmak

13  increased plaintiff's dosage of Thorazine based upon plaintiff's history of "cheeking"

14  medication. (Kuchmak Decl., Ex. A.) Importantly, the internal notes, written by other staff

15  members besides defendant Kuchmak, indicate that the following day, plaintiff's Mini-Team

16  reviewed the events that transpired and agreed that "intervention was appropriately utilized and

17  behavior plan was reimplemented with a couple of changes." (Brown Decl., Ex. I at 4.)

18       With regard to the PPN, plaintiff does not specify what portions of the PPN he found

19  objectionable, false, or outside the boundaries of professional judgment to reflect a conscious

20  indifference. A review of the PPN demonstrates that it appears to summarize and reflect prior

21  internal notes written and observed by defendant Kuchmak as well as other staff members.

22  (Kuchmak Decl., Ex. A.) The court has not found, and the plaintiff has not provided, any

23  discrepancies or contradictory statements between the PPN and the internal notes which were

24

25       [6] There is a factual dispute as to who ordered the seclusion and drug. The internal notes

26  indicate that a Dr. Broadmen ordered both the seclusion and drug. (Brown Decl., Ex. H; Ex. J.)
    Further inquiry reveals that a staff member reported plaintiff himself actually requested both the

27  seclusion and the drug. (Brown Decl., Ex. I at 3.) After plaintiff's request, the staff member
    paged defendant Kuchmak, who was unavailable, so Dr. Broadmen ordered the seclusion and

28  drug instead. (Id.) Regardless, this dispute is not germane to the disposition of this claim.

1   created prior to the PPN.

2       Plaintiff submits no evidence in support of his claim that the order of seclusion and

3   Thorazine and the creation or content of the PPN were outside the scope of professional

4   judgment or that defendant Kuchmak's decisions are not presumptively valid.  Plaintiff's general

5   accusation is not enough in itself to show that professional judgment was not exercised,

6   especially given the content of the internal notes, written by other staff members, that the orders

7   of seclusion and Thorazine were appropriate at the time for plaintiff's behavior, as well as the

8   consistency between the internal notes and the PPN.  There is no genuine issue of material fact

9   on this record, as a matter of law, that indicate defendant Kuchmak's actions were not such a

10  departure from professional standards (if they were a departure at all) that they could not have

11  been based on professional judgment.  See Youngberg, 457 U.S. at 321-22.

12      Accordingly, recognizing that defendant Kuchmak's decision is entitled to a presumption

13  of validity that plaintiff has not rebutted, the court concludes defendant Kuchmak is entitled to

14  summary judgment on this claim.

15      C.    Disability Rights California Employees

16      Plaintiff claims that DRC defendants Blakemore, Mudgett, and Kessler failed in their

17  duties to advocate for him, as employees of DRC.  (SAC at 10.)  Defendants Blakemore,

18  Mudgett, and Kessler move for summary judgment on the ground that their actions were not

19  performed under color of state law as they are private parties, not government entities or

20  officials.  (Dkt. 127, p. 6.)  Plaintiff asserts that defendants Blakemore, Mudgett, and Kessler

21  acted under color of state law because DRC contracts with the California Department of Mental

22  Health to provide advocacy services to mentally disabled patients who are civilly committed in

23  state hospitals operated by the Department of Mental Health, and Defendants Blakemore,

24  Mudgett, and Kessler are employees of DRC.  (SAC at 9-10.)

25      A plaintiff asserting a claim under 42 U.S.C. section 1983 must show that (1) "the

26  conduct complained of was committed by a person acting under color of state law" and that (2)

27  "this conduct deprived the claimant of a constitutional right."  Rinker v. County of Napa, 831

28  F.2d 829, 831 (9th Cir. 1987).  Generally, only a state actor, and not a private individual or

1  entity, may be liable under section 1983 because "§ 1983 excludes from its reach merely private

2  conduct, no matter how discriminatory or wrong." American Mfrs. Mut. Ins. Co. v. Sullivan,

3  526 U.S. 40, 49 (1999) (quotation marks omitted).  There is no right to be free from the infliction

4  of constitutional deprivations by private entities. See Van Ort v. Estate of Stanewich, 92 F.3d

5  831, 835 (9th Cir. 1996).  However, a section 1983 action can lie against a private entity when

6  the private entity is a willful participant in joint action with the state or its agents.  Kirtley v.

7  Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003).  Although there are several tests to determine

8  where state action lies, the ultimate inquiry is whether the alleged infringement of federal rights

9  is fairly attributable to the government.  Id. at 1096.

10  Accordingly, the fact that DRC has a contract with the California Department of Mental

11  Health is not dispositive of this issue.  Instead, the court must analyze  defendants Blakemore,

12  Mudgett, and Kessler's functions within the state system.  The court finds two cases informative

13  in its analysis.  In Kirtley, the Ninth Circuit held that a private individual who had been

14  appointed a minor's guardian ad litem in a family court proceeding was not acting under color of

15  state law.  326 F.3d at 1096.  The court's analysis focused almost exclusively on the statutory

16  definition of guardian.  The guardian ad litem in Kirtley served two primary roles:  (1) "an

17  advocate for the best interests of the child subject to the custody dispute," and (2) "an

18  independent source of information for the court regarding the circumstances of the custody

19  dispute," both of which were to be carried out independently of judicial influence.  Id. at

20  1093-94.  Although a guardian was appointed, compensated, subject to qualification, and

21  regulated by the state, Washington law clearly indicated that the intended benefits of the

22  guardian "flow directly to the child, in whose interests the guardian must act." Id. at 1093

23  (internal citations and quotations omitted).  Accordingly, the court concluded, the guardian ad

24  litem served a private function.

25  Similarly, in Polk County v. Dodson, 454 U.S. 312, 325 (1981), the Supreme Court held

26  that a court-appointed public defender "does not act under color of state law when performing

27  pure advocacy functions."  "[A] lawyer representing a client is not, by virtue of being an officer

28  of the court, a state actor 'under color of state law' within the meaning of § 1983." Id. at 318.  A

1    defense lawyer does not act on behalf of the state or in concert with it, but rather advances "the

2    undivided interests of his client," which is essentially a private function. Id. at 318-19.

3         Applying Kirtley and Polk County to the instant case, the court finds that defendants

4    Blakemore, Mudgett, and Kessler's function was purely private in nature. Plaintiff alleges that

5    defendants Blakemore, Mudgett, and Kessler's function was to advocate for mentally disabled

6    patients in state hospitals. (SAC at 9.) Plaintiff further alleges that he complained to defendants

7    Blakemore, Mudgett, and Kessler about Napa State Hospital defendants' violations of his

8    constitutional rights, however, defendants Blakemore, Mudgett, and Kessler refused to

9    investigate plaintiff's allegations and failed to fulfill their duty to advocate for him. (SAC at 10.)

10        All of plaintiff's allegations against defendants Blakemore, Mudgett, and Kessler relate

11   only to their advocacy functions. As advocates for mental health patients, defendants

12   Blakemore, Mudgett, and Kessler were akin to public defenders and guardians ad litem, who

13   "do[] not act under color of state law when performing pure advocacy functions." See Kirtley,

14   326 F.3d at 1092. Furthermore, defendants Blakemore, Mudgett, and Kessler did not act on

15   behalf of the state or in concert with it, but rather advanced interests of mental health patients

16   such as plaintiff. See Polk County, 454 U.S. at 318-19.

17        The court's conclusion is supported by California Welfare & Institutions Code §§ 5510

18   and 5370.2(a), the enabling statutes for provision of services by DRC. Similar to the guardian ad

19   litem statute in Kirtley, section 5370.2(a) provides that "the State Department of Mental Health

20   shall contract with a single nonprofit agency [such as DRC] to . . . [p]rovide patients' rights

21   advocacy services for, and conduct investigations of alleged or suspected abuse and neglect of,

22   including deaths of, persons with mental disabilities residing in state hospitals." Section 5510

23   further evidences the independence of mental health advocate organizations, such as DRC, by

24   providing that to avoid the potential or appearance for a conflict of interest, the organization and

25   its employees cannot be state employees. The similarities between the statutory definitions of

26   the guardian in Kirtley and that of mental health advocates such as DRC in the instant case show

27   that there is sufficient independence from the state and therefore, defendants Blakemore,

28   Mudgett, and Kessler do not qualify as state actors for section 1983 purposes. Accordingly,

1  plaintiff's section 1983 claims against defendants Blakemore, Mudgett, and Kessler are

2  dismissed with prejudice.[7]

3                                    **CONCLUSION**

4         Defendants Benham and Fu are DISMISSED.  Defendants' motions for summary

5  judgment is GRANTED.

6         The Clerk shall terminate all pending motions, enter judgment, and close the file.

7         IT IS SO ORDERED.

8  DATED: _____11/6/09_____

                                  RONALD M. WHYTE
9                                 United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27         [7]  As the court has determined that plaintiff is unable to establish that defendants

28  Blakemore, Mudgett, and Kessler acted under color of state law, the court need not reach their
   other arguments in favor of dismissal of section 1983 claims against them.